IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| PAM GOOD, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | |
| ) | Case No.  11-CV-0714-MJR-PMF |
| CPI CORP., ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM AND ORDER**

**REAGAN, District Judge:**

Plaintiff Pam Good brought suit against Defendant CPI Corporation after CPI terminated her employment (Doc. 19).[1]  Good alleges that she was subjected to demotion, harassment and discharge from her job in retaliation for filing a Workers' Compensation claim, and due to discrimination based on her age and gender.  Good also claims that her termination stemmed from her filing a complaint with the Illinois Department of Human Rights regarding the workplace harassment she endured.  Good further asserts a claim for intentional infliction of emotional distress.  Before the Court is Defendant CPI Corporation's motion for summary judgment and memorandum of law (Docs. 28 and 29).  Also before the Court is Plaintiff Good's response in opposition (Doc. 30).

---

[1] On June 23, 2011, Plaintiff filed suit in the Circuit Court for the Third Judicial Circuit, Madison County, Illinois.  On August 18, 2011, Defendant removed the action to this federal court, invoking diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).  On February 16, 2012, Plaintiff filed an Amended Complaint (Doc. 19), which now controls.  The Amended Complaint added a common law claim of retaliatory discharged premised upon Plaintiff's having filed a complaint with the Illinois Department of Human Rights.

1

1.  <u>Factual Synopsis</u>

Plaintiff Pam Good, a 51-year-old female, worked for Defendant CPI portrait studios for approximately 24 years—working her way up to manager of CPI's Northwest Plaza studio in Missouri. Good broke her ankle at work in December 2008, after which she had certain physical restrictions, such as having to be able to sit as necessary, and not standing for more than four hours per day. In January 2009, she transferred to CPI's Edwardsville, Illinois location, where she was assistant manager. Thirty-year-old Kelli Schwahn was the new manager of the Edwardsville studio.

Previously, Schwahn had managed Portrait Gallery. CPI is a Sears Portrait Studio, and Portrait Gallery was a spinoff of CPI. Portrait Gallery was being integrated into Sears Portrait Studios, and Good had been asked to move to the Edwardsville studio, at least in part, to lend her years of Sears/CPI experience to the transition effort. According to Carol Wray, a CPI assistant manager of training, Wray and Mark Weigum, CPI District Manager, were periodically working with employees at the Edwardsville studio, training them in Sears Portrait Studio practices, procedures and computer systems.

In February 2009, Good complained to District Manager Weigum that Schwahn was not treating her like a fellow associate and assistant manager. Good perceived that Schwahn did not want her there because she was not Schwahn's first pick as assistant manager, because Good was not a Portrait Gallery alumna. Because of her physical restrictions, Good could perform all of the duties of an assistant manager, except for photography, which entailed standing, stooping and crouching. Schwahn would not allow Good to help train associates, and she reprimanded Good at every opportunity. Good was in tears quite a few times and did not want to go to work.

Manager and assistant manager constantly clashed on the proper way of doing things. Also, Good objected to being scheduled five or six times to work on Sunday when she had church commitments, although she was actually able to get others to work her shift on all but one occasion. When she transferred to Edwardsville, District Manager Weigum had assured Good that she would not routinely be scheduled to work on Sundays. Good's complaints to Weigum and Human Resources officials at CPI were ineffective. Admittedly, Good did not specifically complain of age or gender discrimination. Good has asserted that Studio Manager Kelli Schwahn was retaliating because Good filed a Workers' Compensation claim, but during her deposition Good acknowledged she really does not know what motivated Schwahn.

Good's injured ankle eventually required surgery; consequently, she was off work from May until November, 2009. While on leave, she received Workers' Compensation TTD benefits. When Good returned to work, she still had certain work restrictions: she had a boot and crutches; she could not stand for more than two hours per day, and she had to keep her leg elevated. Again, she could not perform the photography aspect of the assistant manager position. In fact, Good had to return as a mere associate because, a few weeks earlier, District Manager Weigum had hired a 25-year-old to be assistant manager—Dan McKinnon. According to Good, CPI had known for a month when she was projected to return to work. The job had initially been offered to Jody Rouse, a female who was younger than Good, but over 40-years- old. Good thinks it was discriminatory to offer the job to someone with less experience than she—half her age, with no previous managerial experience with CPI. And, Good asserts that McKinnon was paid less than she had been paid as assistant manager. McKinnon would become the only man working at the Edwardsville studio, which had always been staffed by women.

As an associate, Good was to be paid the same as she had been paid as assistant manager, but she would only be guaranteed 30 hours of work per week, instead of 35-40 hours that assistant managers are guaranteed to work.  However, Weigum guaranteed Good 35 hours.  Good acknowledges actually being scheduled to work 35 hours per week and not being affected financially.

The first day she returned to work, November 13, 2009, Good left voicemail messages for District Manager Weigum and the Human Resources Department, complaining that hiring McKinnon to replace her was discriminatory.  Good perceived discrimination stemming from her lodging a Workers' Compensation claim, and also because McKinnon was so young and inexperienced.  According to Good, two studio associates told her that McKinnon could perform the job better because he was younger; otherwise, there were no verbal statements indicating age discrimination.  According to Good, Jody, an associate, told her that CPI did not want Good as assistant manager because of her Workers' Compensation claim.   Good also recalled Schwahn saying that Good was too old to get down on the ground and was therefore not as good a photographer as Schwahn.  Good has testified that there were no statements made reflecting gender discrimination.

Good kept a diary, recording harassment from her first day back at work until she was terminated.  The following principal events are culled from her diary and deposition testimony.  She and others had to memorize a card of customer service responses, but only she had to recite what was on the card, as a sort of test.  On November 17, 2009, when she attempted to use the restroom on her second day back at work, Assistant Manager McKinnon told her she could not do so because Manager Schwahn had instructed him to not let Good do *anything* that was not specifically permitted by Good's doctor's note.  Because McKinnon was her boss, Good

4

said she took him seriously and called her doctor to get another note that specified that she could use the restroom.  On November 27, Schwahn falsely accused Good of eating chips in the studio and then reprimanded her.  When Good denied the allegation, Schwahn threw her hair back and flatly stated that she knew Good had eaten in the studio.  The next day, Schwahn made a second false accusation about Good eating in the studio.  Several more false accusations were made by Schwahn, and she was written up for multiple procedural violations.  Schwahn subsequently told Good that if she were not available to work every day of the week (including Sundays) after her Workers' Compensation period ended, then she would be fired.  On another occasion, Schwahn accused Good of gossiping about her and McKinnon.  During the busy Christmas season, Good describes Schwahn attempting to lure her into violating CPI scheduling policy and turning away customers, but Good turned the tables on Schwahn and reported her to District Manager Weigum.  Good repeatedly called Weigum about these incidents of harassment, but nothing was done.

        Carol Ann Wray, one of the Sears Portrait Studio trainers, testified that, prior to Good starting as assistant manager in Edwardsville, Schwahn told her that she did not want Good as her assistant manager.  According to Wray, Schwahn said she would do whatever she had to do to get rid of Good—staying within the guidelines, using scheduling.  Schwahn feared Good was going to be lazy and not do her job.  Wray described Schwahn singling out Good and treating her in a more abusive manner than she treated others.  Wray witnessed Schwahn lashing out at Good for doing tasks beyond the work limits set by her doctor—telling Good twice that "[a]ll she was supposed to be doing was sitting on her ass and not do nothing except work on the computers." Wray told Schwahn to take Good outside or to the break room to speak to her, not to do it in front of customers.  Wray also suggested Schwahn speak to Good in a professional

manner. Schwahn did not want Wray telling her how to run her studio. Wray reported all of these things to Weigum, who opined that Good and Schwahn would work out their differences.

On December 15, 2009, Schwahn was yelling at Good, who asked her to stop. Good was frustrated; she began to cry and feel as though she was having a heart attack. Schwahn said, "Well you're just a big baby." Good had a panic attack in the studio and had to be taken to the emergency room by a friend. According to Good, the emergency room doctor recommended that Good change jobs or Good was going to die. Good then called Human Resources and District Manager Weigum again, and then filed a written complaint with the Illinois Human Rights Commission.

Schwahn continued to harass Good, falsely accusing her of refusing to assist a customer. Schwahn then ordered that Good no longer help customers or answer the phone. On January 1, 2010, Schwahn told Good that she knew Good had filed a complaint. Good then saw an ad for a customer service position in the home office, so she asked Weigum about transferring. He told her, without explanation, that she could not have the job.

On Friday, January 8, 2010, Schwahn and Good got into an argument about whether Good could work only four hours the next day. That day, after work, she received a call telling her not to report to work on Saturday—because of something she had said that day at work. Eventually, she was informed she had supposedly said to Schwahn: "I can see how that guy in St. Louis went off and did what he did, I feel the same way." Good asserts that she did not make the statement, and she has no idea what it means.

A letter was sent to Good, setting a deadline for her to respond with her explanation. Good testified only that she turned the matter over to her attorney. Good then filed

for short-term disability stemming from stress.  CPI terminated Good's employment on January 26, 2010, for making a threatening comment.

During her deposition, Good summarized her position:  (1) Schwahn discriminated against her based on her age, because Good was older and had more knowledge and experience with CPI; (2) Schwahn discriminated against her based on her gender, because Dan McKinnon was male; (3) Schwahn discriminated against her based on her religion, because she scheduled Good to work on Sundays, and on one occasion Good could not get someone to cover her shift; (4) Schwahn discriminated against her based on her filing a Workers' Compensation case, because she told Good that because she was on Workers' Compensation she was not going to get any special favors—Schwahn just did not want Good there; (5) Weigum discriminated against her when he said McKinnon was fully fit for the job, implying that it was due to his gender; (6) Weigum discriminated against her when he assured her she could continue to have Sundays off, to get her to agree to work in Edwardsville and help Schwahn; he also occasionally called brief staff meetings on Sundays; and (7) Weigum discriminated against her based on her filing a Workers' Compensation case, because he fired her.

## 2.   The Legal Standard for Summary Judgment

Federal Rule of Civil Procedure 56 governs motions for summary judgment. Summary judgment should be granted if the record "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).

In assessing a summary judgment motion, the district court must construe all facts in the light most favorable to, and draw all legitimate inferences in favor of, the nonmovant. *Righi v. SMC Corp.,* 632 F.3d 404, 408 (7th Cir. 2011); *Delapaz v. Richardson,* 634 F.3d 895, 899 (7th Cir. 2011); *Spivey v. Adaptive Marketing, LLC,* 622 F.3d 816, 822 (7th Cir. 2010); *Reget*

7

*v. City of La Crosse,* 595 F.3d 691, 695 (7th Cir. 2010). But once the movant challenges the factual support and legal soundness of the plaintiff's claim, the plaintiff acquires the burden of demonstrating that a genuine fact issue remains for trial. *Marcatante,* 657 F.3d at 440, *citing Boumehdi v. Plastag Holdings, LLC,* 489 F.3d 781, 787 (7th Cir. 2007). *See also Reget,* 595 F.3d at 695.

A genuine issue of material fact remains "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Serednyj v. Beverly Healthcare, LLC,* 656 F.3d 540, 547, *citing Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986). In other words, to survive summary judgment, the plaintiff must produce admissible evidence on which a jury could find in his favor. *Maclin v. SBC Ameritech,* 520 F.3d 781, 786 (7th Cir. 2008).

3.   Analysis

Each of Defendant CPI's arguments for summary judgment and Plaintiff Good's response will be addressed in turn.

Count I: Retaliatory Discharge (Workers' Compensation Claim)

Count I alleges that, in retaliation for Good initiating a Workers' Compensation claim, CPI demoted Good from assistant manager to associate at a lower pay and responsibility level, then took a series of retaliatory disciplinary actions that lead to her wrongful discharge. In broad terms, a retaliatory discharge claim requires proof that: (1) employment was terminated by the employer; (2) the discharge was in retaliation for action of the employee; and (3) the discharge violates a clear mandate of public policy. *Michael v. Precision Alliance Group, LLC*, 952 N.E.2d 682, 687 (Ill. App. 5th Dist. 2011) (citing *Barr v. Kelso-Burnett Co.*, 478 N.E.2d 1354, 1358 (Ill. 1985). The Illinois Supreme Court has long held that a Workers' Compensation

claim is a protected act upon which a retaliatory discharge claim may be based. *Kelsay v. Motorola, Inc.*, 384 N.E.2d 353, 357 (Ill. 1978).

Defendant CPI argues that Plaintiff Good cannot prove that her discharge was for making a Workers' Compensation claim. From CPI's perspective, Good has no proof, other than her own assertions. Plaintiff Good counters that, construing the evidence in the light most favorable to her, one could only conclude that Good had been retaliated against and discharged due to her Workers' Compensation claim. Good highlights Schwahn's comment that Good should not expect any special treatment because of her Workers' Compensation claim, Schwahn's threat that as soon as Good's Workers' Compensation period ended she would be fired if she did not work Sundays, and McKinnon's explanation that Schwahn had instructed him to hold Good to her doctor's restrictions, which did not mention being able to get up to go to the restroom.

CPI correctly observes that there is no *direct* proof that Good was discharged in retaliation for lodging a Workers' Compensation claim; she relies on her perception of events. However, retaliatory discharge may be established by circumstantial evidence; consequently, the issue of causation is usually not appropriate for summary judgment. *Zuccolo v. Hannah Marine Corp.*, 900 N.E.2d 353, 359-360 (Ill.App. 1st Dist. 2008); *Michael v. Precision Alliance Group, LLC*, 952 N.E.2d 682, 690 (Ill.App. 5th Dist. 2011). Furthermore, the causation element of a retaliation claim is not met if the employer has a valid, non-pretextual basis for discharging the plaintiff.[2] *Grabs v. Safeway, Inc.* 917 N.E.2d 122, 126 (Ill.App. 1st Dist. 2009).

---

[2] An employer may not discharge an employee on the basis of a dispute about the extent or duration of a compensable injury, but may discharge the employee for reasons wholly unrelated to the Workers' Compensation claim. *Grabs v. Safeway, Inc.*, 917 N.E.2d 122, 127 (Ill. App. 1st Dist. 2009) (citing *Clark v. Owens-Brockway Glass Container, Inc.*, 697 N.E.2d 743, 746 (Ill. App. 5th Dist. 1998)).

The myriad of incidents detailed by Plaintiff Good could be perceived as retaliation for filing a Workers' Compensation claim, particularly given the timing and undercurrent of hostility linked to Good's Workers' Compensation status.  Moreover, there is insufficient evidence in the record before the Court regarding the proffered reasons for termination.  The Court cannot even eliminate the possibility that the stated reason for terminating Good was pretextual.  Therefore, summary judgment will not be granted on Count I.

Count II:  Intentional Infliction of Emotional Distress

Count II of the Amended Complaint alleges intentional infliction of emotional distress.  More specifically, it is alleged that CPI knew that, as a result of Good's serious ankle injury and related pain and disability, Good was in a weakened physical and emotional condition at the time of the write-ups, disciplinary actions, demotion and discharge.

In order to establish intentional infliction of emotional distress, a plaintiff must prove that: (1) the defendant engaged in "extreme and outrageous" conduct toward the plaintiff; (2) the defendant intended or recklessly disregarded the probability that the conduct would cause the plaintiff to suffer emotional distress; (3) the plaintiff endured "severe or extreme" emotional distress; and (4) the defendant's conduct actually and proximately caused the plaintiff's distress. *Ulm v. Memorial Medical Center*, 964 N.E.2d 632, 641 (Ill. App. 4th Dist. 2012) (citing *Hayes v. Illinois Power Co.,* 587 N.E.2d 559, 563 (Ill. App. 4th Dist. 1992). Although this is a fact-intensive inquiry, whether conduct is "extreme and outrageous" is an objective standard and a question of law for the Court to decide. *Ulm*, 964 N.E.2d at 641-642 (citing *Thomas v. Fuerst*, 803 N.E.2d 619, 625 (Ill. App. 1st Dist. 2004)).

> Extreme and outrageous behavior does not include "mere insults, indignities, threats, annoyances, petty oppressions or trivialities." To give rise to liability, it is insufficient that the conduct complained of "has been characterized by 'malice.'"  The defendant's conduct must be "so

> outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency." That is, the case must be such that the "recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous [!]' "

*Ulm*, 964 N.E.2d at 642 (internal citations to *Hayes*, 587 N.E.2d at 563, and *Reilly v. Wyeth,* 876 N.E.2d 740, 755 (Ill. 2007) omitted). Whether the defendant enjoys a position of authority over the plaintiff is a relevant factor for consideration. *Public Finance Corp. v. Davis,* 360 N.E.2d 765, 767 (Ill. 1976).

> However, due to the sensitivities of the employment relationship, courts have required an employer's conduct to be "truly * * * egregious" before it may give rise to liability. *Lewis v. School District # 70,* 523 F.3d 730, 747 (7th Cir. 2008). This is because "[e]mployers often and necessarily take actions during the course of business that result in emotional distress." *Id.;* see also *Wal–Mart Stores, Inc. v. Bertrand,* 37 S.W.3d 1, 13 (Tex. Ct. App. 2000) ("[E]mployers need to be able to supervise, review, criticize, demote, transfer, discipline and terminate employees. These circumstances are often stressful and unpleasant for an employee and at times may even be unwarranted. Nevertheless, an employer must have latitude to exercise these rights in a permissible way even though emotional distress results.").

*Ulm*, 964 N.E.2d at 642 (internal citations and notations within parentheticals omitted).

CPI cites *Barner v. City of Harvey*, 1996 WL 199745 (N.D.Ill. 1996), as an example of similar circumstances that were found not to rise to the level of extreme and outrageous conduct. In *Barner* the defendants harassed the plaintiffs by repeatedly writing them up on false charges, wrongfully suspending them and setting them up for discharge in an effort to force them to resign. However, CPI ignores that in *Barner* the district court, citing *Johnson v. Federal Reserve Bank of Chicago*, 557 N.E.2d 328 331 (Ill.App. 1st Dist. 1990), recognized that the same conduct motivated by retaliation could satisfy the criteria for extreme and outrageous conduct. Similarly, in this case context may be determinative. Wray's reaction to the interaction

11

between Schwahn and Good certainly suggests that a jury could exclaim, "Outrageous!" Therefore, summary judgment will not be granted relative to Count II.

### Count III:  Discrimination

In Count III, Plaintiff Good alleges that she was discriminated against based on her age and gender, in violation of the Illinois Human Rights Act (IHRA), 775 ILCS 5/1-101 *et seq*.  The IHRA provides that it is illegal:  "For any employer to refuse to hire, to segregate, or to act with respect to recruitment, hiring, promotion, renewal of employment, selection for training or apprenticeship, discharge, discipline, tenure or terms, privileges or conditions of employment on the basis of unlawful discrimination."  775 ILCS 5/2–102(A).  Good, a 51-year-old female with 24 years of experience, cites her demotion and replacement by Dan McKinnon, a male, approximately 25 years old, who had less experience and was less qualified.  Good also points to her 30-year-old manager, Kelli Schwahn, who harassed her, leading to Good's discharge.

#### A.  Age Discrimination

CPI cites the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 *et seq*., various ADEA precedents, and *Gross v. FBL Financial Services, Inc.*, 557 U.S. 167 (2009), for  the proposition that, as part of her initial *prima facie* case, Plaintiff must prove that age was the "but-for" cause of all of the adverse employment action taken by CPI.  From CPI's perspective, a "stray, isolated" remark about Schwahn being a better photographer because of her younger age, and the fact that Good's pay, hours and other benefits were never diminished, is insufficient to establish "but-for" causation.  Plaintiff Good counters that Manager Schwahn focused on her age, and did not discourage other associates from commenting about Good's age—the "but-for" causation of  an atmosphere hostile to Good.

As a preliminary matter, the Court notes that Defendant and Plaintiff incorrectly believe the "but-for" standard announced in *Gross* is controlling at this juncture. Relative to the burden of proof in IHRA claims, the Illinois Supreme Court has adopted the standard used in federal claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, as articulated most famously in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Zaderaka v. Illinois Human Rights Commission,* 545 N.E.2d 684, 687-688 (Ill. 1989); *Budzileni v. Department of Human Rights*, 910 N.E.2d 1190, 1206-1207 (Ill. App. 1st Dist. 2009). Under that standard,

> the petitioner must first establish by a preponderance of the evidence a *prima facie* case of unlawful discrimination. If a *prima facie* case is established, a rebuttable presumption arises that the employer unlawfully discriminated against the plaintiff. Second, to rebut the presumption, the employer must articulate, not prove, a legitimate, nondiscriminatory reason for its decision. Third, if the employer articulates such a reason, the plaintiff must prove, again by a preponderance of the evidence, that the employer's reason was untrue and was pretext for discrimination. Under this test, the ultimate burden of persuasion remains on the plaintiff throughout the proceedings.

*Budzileni*, 910 N.E.2d at 1204 (internal citations to *Zaderaka* omitted). In accord with *Mt. Healthy Board of Education v. Doyle*, 429 U.S. 274, 287 (1977), the *prima facie* case may be established by evidence sufficient to show the impermissible factor was a "motivating factor" for the employment decision.

The parties ignore the more recent precedent, *Kidwell v. Eisenhauer*, 679 F.3d 957 (7th Cir. 2012), wherein the Court of Appeals for the Seventh Circuit explained that the "but-for" standard is not applicable at the summary judgment stage. Although *Gross* requires "but-for" causation at trial, at the summary judgment stage, the burden of proof remains split between the parties, leaving the *Mt Healthy* standard in tact relative to the *prima facie* case. *Kidwell*, 679 F.3d at 964-965. Plaintiff must produce evidence that her age was at least a "motivating factor"

in the employer's decision to take adverse action; then, the burden shifts to the employer to rebut the causal inference; if the burden is not rebutted, "but-for" causation is established. *See Id*. at 965.

Because the parties have not applied the appropriate analytical framework, the Court need not dwell on this issue, except to observe that the evidence is more than just a stray remark and speculation, as CPI asserts. There is circumstantial evidence from which a jury could infer a work environment hostile to Good because of her age. The evidence is weak, particularly since Good's colleague Jody Rouse, was apparently over forty-years-old, worked at the same studio, and was offered the job of assistant manager. However, Schwahn and McKinnon's ages, several remarks linking performance to age (by Schwahn and two studio assistants), and the apparent hostility toward Good, despite her years of managerial service, could suffice. *See Kidwell*, 679 F.3d at 965-966.

B.   Sex Discrimination

The parties' analysis is similarly flawed relative to the alleged discrimination based on Good's gender. Nevertheless, because there is a total absence of evidence of evidence to support a claim for sex discrimination, CPI is entitled to summary judgment on this aspect of Count III.

The sex discrimination alleged in Count III of the Amended Complaint is premised entirely upon the fact that Good was replaced as assistant manager by a male, Dan McKinnon. Good ignores that the position was initially offered to a female, and that McKinnon was, except for temporary employees brought in during busy periods, the only male in the Edwardsville studio. McKinnon was also paid less than Good. "Even on summary judgment, district courts are not required to draw every requested inference; they must only draw

reasonable ones that are supported by the record." *Omnicare, Inc. v. UnitedHealth Group, Inc.,* 629 F.3d 697, 704 (7th Cir. 2011).  There is no evidence from which to reasonably infer that Good's gender was a "motivating factor" in any of the events of which Good complains.

<u>Count IV: Retaliatory Discharge (IDHR Claim)</u>

A second retaliatory discharge claim is asserted in Count IV, premised not upon Plaintiff Good's Workers' Compensation claim, but instead stemming from Good's complaint with the Illinois Department of Human Rights (IDHR).  According to Good, on January 4, 2010, Manager Schwahn told Good that she knew Good had filed a state complaint.  On January 8, 2010, Good was told not to return to work because of a statement made to Schwahn that was construed as a threat.  Good flatly denies ever making such a statement.  Shortly thereafter, Good was officially terminated based on the alleged threatening statement.

CPI contends that the Amended Complaint is insufficient on its face, because it alleges that the Equal Employment Opportunity Commission (EEOC) issued Plaintiff a right to sue (which was not attached to the pleading as indicated).  CPI observes that the Illinois Human Rights Act (IHRA), 775 ILCS 5/8-111, requires that a complaint first be brought with the Department of Human Rights, not the EEOC; therefore, this federal district court may lack subject-matter jurisdiction.  CPI further argues that there is no causal connection between Good's IDHR complaint and her discharge.  From Good's perspective, it is reasonable to infer retaliatory motive from Schwahn's mentioning of the complaint (in an antagonistic tone), followed by the fabrication of a threatening remark.

CPI correctly observes that an IHRA claim must first be presented to the IDHR, before judicial review is sought.  775 ILCS 5/8-111(C).  Therefore, exhaustion through the EEOC would be irrelevant—unless Good is asserting an EEOC claim, which is possible. *See*

*Blount v. Stroud*, 904 N.E.2d 1 (Ill. 2009) (analyzing the similarities and differences between an IHRA claim and an EEOC claim). With that said, an IDHR right to sue letter is part of the record (Doc. 2-1). One of four issues raised was deemed supported by substantial evidence; which issue is unknown to the Court. Because the parties do not explore this issue in any greater depth, the Court's analysis will also end, for now.

Insofar as CPI asserts that there is insufficient evidence of causation, the Court cannot agree. Again, context and credibility can make or break a claim premised upon circumstantial evidence. Therefore, as with Count I, summary judgment is inappropriate.

### 4. Conclusion

For the reasons stated, Defendant CPI's motion for summary judgment (Doc. 28) is **GRANTED IN PART AND DENIED IN PART**; CPI is **GRANTED** summary judgment with respect to the sex/gender discrimination claim asserted in Count III of the Amended Complaint. The age discrimination aspect of Count III and all other claims shall proceed to trial.

**IT IS SO ORDERED.**

DATE:  September 18, 2012

s/ Michael J. Reagan
MICHAEL J. REAGAN
UNITED STATES DISTRICT JUDGE